UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHARTIS SPECIALTY
INSURANCE CO., f/k/a AMERICAN
INTERNATIONAL SPECIALTY
LINES INSURANCE CO.,

          Plaintiff,

    v.

RCI/HERZOG, et al.,

         Defendants.

CASE NO. C11-0437JLR

ORDER ON PLAINTIFF'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT

## I.   INTRODUCTION

This is an insurance coverage dispute.  Plaintiff Chartis Specialty Insurance

Company, f/k/a American International Specialty Lines Insurance Company ("Chartis")

moves for partial summary judgment on its declaratory judgment claims that it had no

duty to defend its insured, Defendant RCI/Herzog ("RCIH"), in an arbitration proceeding

between RCIH and Central Puget Sound Regional Transit Authority ("Sound Transit")[1] (Count 4), and that it has no obligation to indemnify RCIH for the $1.725 million dollars awarded to Sound Transit by the arbitration panel (Count 6). (Not. of SJ Mot. & SJ Mot. (Dkt. # 27) at 1-2; *see also* Mem. in Support of SJ Mot. ("Mot.") (Dkt. # 27-1).)

As an initial matter, RCIH agrees with Chartis that the excess liability policies under which RCIH is an additional insured (*see* Taylor Decl. (Dkt. # 27-4) ¶ 6; Not. of Lodgment of Ex. ("NOL") Ex. 22 (Dkt. # 27-9)) are not implicated by RCIH's present insurance claims against Chartis. (Resp. (Dkt. # 35) at 27; *see also* Mot. at 23-24.) The court therefore grants summary judgment to Chartis on the limited issue of whether there is coverage under the excess liability policies. RCIH, however, disputes Chartis's claims that it owes no duty to defend or indemnify RCIH under the primary policies under which RCIH is an additional insured. (*See generally* Resp.) Having considered the submissions of the parties, the balance of the record, the relevant law, and deeming oral argument unnecessary, the court GRANTS in part and DENIES in part Chartis's motion for partial summary judgment (Dkt. # 27).[2]

---

[1] Chartis originally named Sound Transit as a defendant in the instant action; however, Sound Transit has been dismissed without prejudice pursuant to stipulation by the parties (Dkt. # 34).

[2] Chartis has requested oral argument. (Mot. at 1.) The general rule is that the court may not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied. *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964). Federal Rule of Civil Procedure 56, however, does not require a hearing where the opposing party does not request it. *See, e.g.*, *Demarest v. United States*, 718 F.2d 964, 968 (9th Cir. 1983). Moreover, oral argument is not necessary where the non-moving party suffers no prejudice. *Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984). "When a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no

## II.    BACKGROUND

**A. The Policies**

In February 2004, RCIH entered into a contract with Sound Transit ("the Contract") to act as the general contractor on a five-mile segment of the Link Light Rail System, known as the Rainier Valley C735 segment ("the Project").  (*See* Sager Decl. (Dkt. # 27-3) ¶ 6; NOL Ex. 1 (Dkt. # 27-7); RCIH Answer/Counterclaim (Dkt. # 12) ¶ 7.) RCIH was insured for the Project under Chartis commercial general liability policy number 933-13-37, effective January 1, 2003, through January 1, 2007, and policy number 179-04-22, effective January 1, 2007, through January 1, 2010 ("the Policies"). (Taylor Decl. ¶¶ 3, 4; NOL Ex. 20 (Dkt. # 27-9), Ex. 21 (Dkt. # 27-9).)[3]

Pursuant to the Policies, Chartis agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  (NOL Ex. 20 § I(1)(a).)  Further, Chartis agreed to "have the right and duty to defend the insured against any 'suit' seeking those damages," but stated that it would "have no duty to defend the insured against any 'suit' seeking damages for . . . 'property damage' to which this insurance does not apply."  (NOL Ex. 20 § I(1)(a).) The Policies define "suit" as:

---

prejudice [in a refusal to grant oral argument]."  *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*).  "In other words, a district court can decide the issue without oral argument if the parties can submit their papers to the court."  *Id.*  Here, the issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the court.  Accordingly, the court denies Chartis's request for oral argument.

[3] Because the citations to the relevant provisions in the Policies are identical, the court will cite only to Exhibit 20 throughout this order.

[A] civil proceeding in which damages because of . . . "property damage" . . . to which this insurance applies are alleged. "Suit" includes:

    a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

(NOL Ex. 20 § V(18).)

The Policies exclude from coverage "'property damages' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." (NOL Ex. 20 § I(2)(b).) This contractual liability exclusion does not apply to, among other things, liability for damages "[t]hat the insured would have in the absence of the contract or agreement." (NOL Ex. 20 § I(2)(b).)

The Policies further provide for certain duties on the part of the insured in the event of an "occurrence" or "suit":

    a.  You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. . . .

    b.  If a claim is made or "suit" is brought against any insured, you must:

        (1)  Immediately record the specifics of the claim or "suit" and the date received; and

        (2)  Notify us as soon as practicable.

        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    c.  You and any other involved insured must:

        (1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2)  Authorize us to obtain records and other information;

(3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; . . . .

d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(NOL Ex. 20 § IV(2).)  The Policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (NOL Ex. 20 § V(13).)

**B.  The Events Giving Rise to the Instant Coverage Dispute**

Work on the Project began in February 2004.  (Answer ¶ 8.)  During construction, RCIH encountered a number of deficiencies on the part of Sound Transit which caused RCIH substantial expense and delay on the Project.  (Brummond Decl. (Dkt. # 37) ¶¶ 2, 4.)  Also, at some point during the course of the Project, Sound Transit asserted certain claims against RCIH related to concrete work performed by RCIH and/or its subcontractors.[4]  (Counterclaim ¶ 10.)

The Contract required RCIH to provide Sound Transit with notice of its intent to submit any claims for additional compensation to Sound Transit within ten days of the event or occurrence giving rise to the claim, and to submit the actual claim within 60 days of the notice.  (NOL Ex. 1 at 182 (General Provisions Art. 10.01).)  On or about April 10, 2006, RCIH and Sound Transit (collectively, "the Parties") entered into a

_____

[4] The evidence in the record does not establish when Sound Transit first notified RCIH of its claim.

ORDER- 5

"Tolling Agreement" whereby they agreed to toll the time in which RCIH was required to submit notices of its intent to claim, as well as the claims themselves. (Sager Decl. ¶ 4; NOL Ex. 2 (Dkt. # 27-8).) The Parties amended the Tolling Agreement twice. (Sager Decl. ¶ 4; NOL Ex. 3 (Dkt. # 27-8), Ex. 4 (Dkt. # 27-8.)

On or about August 2, 2006, the Parties entered into a "Principles of Negotiation" agreement to facilitate the Parties' "discussions and negotiations concerning delays and extra costs allegedly incurred by [RCIH] arising from the execution of the work on [the Project] . . . ." (NOL Ex. 5 (Dkt. # 27-8); *see also* Sager Decl. ¶ 5.) The Principles of Negotiation agreement provided that the Parties would exchange project documents and negotiate RCIH's claims against Sound Transit in good faith and under the protection of Federal Rule of Evidence 408. (*See generally* NOL Ex. 5.) The agreement also provided that Sound Transit "does not waive its contractual rights and defenses against [RCIH]." (*Id.* ¶ 1.)

On or about April 3, 2007, the Parties entered into an "Interim Settlement Agreement," although the agreement did not constitute the actual settlement of any claims. (Sager Decl. ¶ 7; NOL Ex. 6 (Dkt. # 27-8).) Under the Interim Settlement Agreement, the Parties agreed to defer dispute resolution of all claims and defenses by the Parties until the Project was substantially completed and to continue the Tolling Agreement as amended. (NOL Ex. 6.) The agreement set forth "milestone" deadlines for completion of the Project and amounts that Sound Transit would pay to RCIH upon completion of those milestones. (*Id.*) The agreement also set forth the Parties'

anticipated protocol and completion dates for the dispute resolution process set forth in the Contract.  (*Id.*)

With respect to dispute resolution, the Contract authorized the Parties to establish a Dispute Review Board ("DRB") to assist them in resolving any disputes that arose during the Project.  (NOL Ex. 1 at 189-190 (General Provisions Art. 11).)  The recommendations of the DRB were non-binding and inadmissible in any court, arbitration, or other legal proceeding.  (NOL Ex. 1 at 253 (Special Provisions Art. 11.05(4)).)  The Parties utilized a DRB throughout the Project.  (Brummond Decl. ¶ 3.) The three members of the DRB were (1) Don Irwin, the former director of Portland, Oregon's light rail transit system, who was a law school graduate and experienced American Arbitration Association arbitrator; (2) Norm Anderson, a former chief construction engineer of the Washington State Department of Transportation, who was a professional engineer and experienced DRB participant; and (3) John Hunt, an experienced contractor and construction consultant, arbitrator, and DRB member.  (*Id.*)

In June 2009, the Parties entered into an "Alternative Dispute Resolution Agreement" ("the ADR Agreement").  (Sager Decl. ¶ 8; NOL Ex. 7 (Dkt. # 27-8).)  The ADR Agreement provided for an alternative dispute resolution process using the existing members of the DRB as an arbitration panel to hear and decide all of the disputes between the Parties arising from the Project.  (NOL Ex. 7 ¶ 1.)  The Parties agreed that the decision of the arbitration panel would be final and binding on the Parties, subject to the vacation, modification, and correction provisions of Washington's Uniform Arbitration Act, chapter 7.04A RCW.  (NOL Ex. 7 ¶ 1.)  The ADR Agreement also

1  provided that the arbitration would begin within ten months of the execution of the

2  agreement, and it set forth guidelines for discovery.  (*Id.* ¶ 3.)  The Parties further agreed

3  that the arbitration panel's determination of damages in favor of RCIH would be no less

4  than $40 million and no more than $85 million, after the deduction of amounts awarded

5  in Sound Transit's favor, if any.[5]  (*Id.* ¶¶ 1, 6.)  The amounts paid by Sound Transit

6  pursuant to the Interim Settlement Agreement would be credited toward any amounts

7  awarded by the arbitration panel.  (*Id.* ¶ 6.)  The ADR Agreement additionally provided

8  that the Parties would amend the Contract to reflect the content of the ADR Agreement

9  (*id.* ¶¶ 2, 9); however, there is no evidence in the record that the Parties in fact executed

10  such an amendment.

11       The arbitration proceeding between the Parties that went forward after the

12  execution of the ADR Agreement was captioned *RCI/Herzog v. Central Puget Sound*

13  *Regional Transit Authority* ("the Underlying Arbitration").  (Sager Decl. ¶ 2.)  On

14  February 10, 2010, RCIH submitted its Confirmation of Claims to Sound Transit.  (Sager

15  Decl. ¶ 2; NOL Ex. 8 (Dkt. # 27-8).)  RCIH asserted claims for failure to disclose

16  material facts, defective design, unreasonable design changes, failure to pay for directed

17  acceleration of work, abandonment of the Contract, and related deficiencies on the part of

18  Sound Transit.  (*See generally* NOL Ex. 8.)  RCIH claimed that its damages exceeded

19  $100 million.  (*Id.* at 5.)  On February 17, 2010, Sound Transit filed its Confirmation of

20  ────────────────

21     [5] The ADR Agreement states:  "[I]n no event shall the total net amount awarded to
[RCIH] exceed the upper bracket described in paragraph 6 below.  The term 'net' means the

22  amount awarded to [RCIH] after the deduction, if any, of amounts awarded in Sound Transit's
favor for items including liquidated damages, attorneys' fees and costs."  (NOL Ex. 7 ¶ 1.)

Counterclaims, which alleged that RCIH's work was delayed and defective and included

allegations of cracked and failed concrete. (Sager Decl. ¶ 3; NOL Ex. 9 (Dkt. # 27-8).)

Sound Transit's Confirmation of Counterclaims was Sound Transit's first formal

statement and assertion of a claim and request for damages or reimbursement of cost to

RCIH with respect to the concrete cracking issue. (Brummond Decl. ¶ 6.)

On March 25, 2010, RCIH notified Chartis of the Underlying Arbitration and

tendered defense of Sound Transit's counterclaims. (Taylor Decl. ¶ 8; NOL Ex. 10 (Dkt.

# 27-8).) The tender letter to Chartis notified Chartis that RCIH and Sound Transit had

entered into the ADR Agreement in 2009 and enclosed a copy of the agreement. (NOL

Ex. 10.) RCIH requested confirmation by Chartis that it would agree to defend Sound

Transit's counterclaims in the Underlying Arbitration. (*Id.* at 2.) This was the first time

that Chartis was advised of the claims arising out of RCIH's work on the Project. (Taylor

Decl. ¶ 11.) By at least June 11, 2010, Chartis had assigned attorney Richard Martens as

RCIH's defense counsel for the counterclaims. (Powell Decl. (Dkt. # 36) Ex. 1.)

On August 9, 2010, Chartis issued a reservation of rights letter to RCIH regarding

its defense and indemnity obligations. (Taylor Decl. ¶ 11; NOL Ex. 11 (Dkt. # 27-8).)

The letter stated that an authorized representative of Chartis would conduct an

investigation and provide RCIH with a defense subject to a reservation of rights. (NOL

Ex. 11 at 1.) The letter generally reserved "all" of Chartis's rights and set forth four

specific provisions of the Policies that "may preclude or limit coverage for this matter":

(1) the definition of "occurrence"; (2) Exclusion k for "property damage" to RCIH's

products; (3) Exclusion l for "property damage" to RCIH's work; and (4) Exclusion m for

damage to property which is not physically injured but which cannot be used due to RCIH's defective work. (*Id.* at 2-3.) Finally, the letter formally apprised RCIH that Mr. Martens had been assigned as defense counsel. (*Id.* at 1.)

By letter dated August 18, 2010, Mr. Martens advised Chartis and RCIH of his preliminary defense plan. (Powell Decl. Ex. 2.) Mr. Martens associated with RCIH's existing counsel as co-counsel and assisted in all aspects of the pre-arbitration preparations. (*Id.* ¶ 6.)

On March 9, 2011, five days before the Underlying Arbitration began, Chartis sent a supplemental reservation of rights letter to RCIH. (Taylor Decl. ¶ 10; NOL Ex. 12 (Dkt. # 27-8).) Chartis notified RCIH that although it would continue to provide RCIH with a defense to Sound Transit's counterclaims, it had no duty to indemnify RCIH. (NOL Ex. 12 at 2.) Chartis asserted that the arbitration proceeding did not constitute a "suit" within the meaning of the Policies, that no coverage would be available for damages that RCIH was not "legally obligated to pay," and that Chartis was not responsible to pay for contractually assumed liability. (*Id.* at 5-7.) Chartis also raised as defenses to coverage that RCIH failed to properly notify Chartis of an "occurrence" or offense that may result in a claim, failed to cooperate, and voluntarily agreed to pay Sound Transit. (*Id.* at 7-9.)

The eight-week Underlying Arbitration began on March 14, 2011. (Powell Decl. ¶ 7.) It concluded on May 5, 2011, and the arbitration panel issued an interim award on

June 20, 2011.[6]  (Gil Decl. (Dkt. # 27-5) ¶ 6; NOL Ex. 14 (Dkt. # 27-8).)  The arbitration

panel found that Sound Transit materially breached the Contract and awarded RCIH

nearly $70.9 million in damages.  (NOL Ex. 14 at 1.)  This award included an offset of

the costs that the arbitration panel found were reasonably attributable to RCIH's bid

errors and self-inflicted impacts.  (*Id.* at 3.)  The arbitration panel also found in favor of

Sound Transit on its concrete cracking counterclaim and awarded Sound Transit $1.725

million dollars.[7]  (*Id.*)  The arbitration panel further granted in part Sound Transit's

liquidated damages claim and awarded Sound Transit approximately $2.8 million in such

damages.  (*Id.* at 4.)  The arbitration panel issued a lengthy memorandum in support of its

interim award.  (Gil Decl. ¶ 9; NOL Ex. 15 (Dkt. # 27-8).)  After several requests from

Chartis, RCIH sent Chartis a full copy of the arbitration panel's memorandum on July 18,

2011.  (Gil Decl. ¶ 9.)

On or about July 30, 2011, the Parties entered into a "Settlement Agreement and

Release" ("the Settlement Agreement").  (Gil Decl. ¶ 12; NOL Ex. 17 (Dkt. # 27-9).)

The Settlement Agreement provided for the Parties "to close out the Project and resolve

all Claims and other issues between the Parties related to the Project . . . ."  (NOL Ex. 17

at 1.)  More specifically, Sound Transit agreed to issue to RCIH a check in the amount of

---

[6] Rather than simply issuing a final award, the arbitration panel issued an interim award
to allow the parties to determine whether the award triggered the attorneys' fees provision in the
ADR Agreement.  (Brummond Decl. ¶ 11.)  Neither party, however, was entitled to recover
attorneys' fees.  (*Id.*)

[7] Sound Transit had originally sought damages in excess of $5 million for its concrete
cracking counterclaim.  (Brummond Decl. ¶ 10.)

1  approximately $50.6 million (*id.* ¶ 2), which reflected the arbitration panel's interim

2  award to Sound Transit less the prior advance payments Sound Transit made to RCIH

3  and the liquidated damages (Brummond Decl. ¶ 13).  RCIH also agreed to issue to Sound

4  Transit a check in the amount of $1.725 million dollars representing the portion of the

5  interim award related to Sound Transit's concrete cracking counterclaim.  (NOL Ex. 17

6  ¶ 3.)  The Settlement Agreement further included provisions to close out the Project (*see*

7  *generally id.*), and directed the arbitration panel to vacate the interim award and issue a

8  final award as directed by the Settlement Agreement (*id.* ¶ 15).  According to RCIH,

9  there were no post-arbitration settlement discussions, compromises, discounts, or other

10  concessions made by the Parties.  (Brummond Decl. ¶ 13.)  Chartis has presented

11  evidence, however, that it was advised that RCIH and Sound Transit engaged in

12  settlement discussions and had asked the arbitration panel to delay issuing a final award

13  until these discussions had concluded.  (Gill Decl. ¶ 10.)

14      On August 5, 2011, the arbitration panel issued its final award, which incorporated

15  by reference the Settlement Agreement.  (Gil Decl. ¶ 12; NOL Ex. 18 (Dkt. # 27-9).)  The

16  final award states that the total settlement amount reflected in the Settlement Agreement

17  of $50,626,533.00 is "subject to an offset for the [$1.725 million] the Panel has found

18  due to Sound Transit for its counterclaims related to the 'cracked concrete' issue."  (NOL

19  Ex. 18 at 2.)

20

21

22

## C. Procedural History

On March 11, 2011, three days before the Underlying Arbitration began, Chartis filed the instant action against RCIH and Sound Transit.[8] (Compl. (Dkt. # 1).) Chartis seeks declaratory relief regarding the rights, duties, and obligations of itself and RCIH, if any, under the Policies with respect to coverage and/or potential coverage for the claims alleged in Sound Transit's concrete cracking counterclaim. (*See generally id.*) On August 18, 2011, RCIH filed its answer and counterclaims. (Answer/Counterclaim.)

On March 19, 2012, Chartis filed the instant motion for partial summary judgment, seeking a declaration that it had no duty to defend RCIH in the Underlying Arbitration (Count 4) and that it has no duty to indemnify RCIH for the $1.725 million in damages awarded on Sound Transit's concrete cracking counterclaim. (*See generally* Mot.) Chartis maintains that a finding in its favor on these causes of action would provide an absolute defense to RCIH's claims for defense and indemnity and would render all remaining causes of action moot, with the exception of Chartis's fifth cause of action, which seeks reimbursement for amounts incurred in RCIH's defense with regard to matters not covered under the Policies. (*Id.* at 9.)

---

[8] RCIH did not learn of the instant lawsuit until one of Chartis's attorneys informed RCIH's representatives during the third day of the hearing in the Underlying Arbitration. (Powell Decl. ¶ 9.) Chartis had not previously served RCIH with a copy of the complaint, and RCIH's representatives were surprised to learn this information. (*Id.*) Counsel for the Parties asked Chartis's attorney to leave, and after subsequent discussions between the Parties and Chartis, the Parties agreed that Chartis's representatives could attend the remainder of the hearing. (*Id.*; *see also* Gil Decl. ¶¶ 4-5.)

# III.    ANALYSIS

## A.  Legal Standards

### 1.  Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.  The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### 2.  Washington Insurance Law Standards

Washington courts have long held that the duty to defend is different from and broader than the duty to indemnify.  *Am. Best Food, Inc. v. Alea London, LTD*, 229 P.3d 693, 696 (Wash. 2010) (citing *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 504-05 (Wash. 1992)).  "The duty to defend arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured

within the policy's coverage." *Truck Ins. Exch. v. VanPort Homes, Inc.*, 58 P.3d 276, 281-82 (Wash. 2002) (internal quotation omitted). "When the facts or the law affecting coverage is disputed, the insurer may defend under a reservation of rights until coverage is settled in a declaratory action." *Am. Best Food*, 229 P.3d at 696 (citing *Truck Ins.*, 58 P.3d at 282). The duty to indemnify, by contrast, exists only if the policy actually covers the insured's liability. *Id.*

The criteria for interpreting insurance policies in Washington are well settled. Courts construe insurance policies as contracts. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash. 2000). Courts consider the policy as a whole and give it a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id.* (quoting *Am. Nat'l Fire Ins. Co. v. B & L Trucking & Const. Co.*, 951 P.2d 250, 256 (Wash. 1998)). If the policy language is clear and unambiguous, courts must enforce it as written and may not modify it or create ambiguity where none exists. *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005). A clause is only considered ambiguous if it is susceptible to two or more reasonable interpretations. *Id.* If an ambiguity exists, the clause is construed in favor of the insured. *Id.*

**B. Chartis's Motion for Partial Summary Judgment**

Chartis makes several arguments in support of its motion for partial summary judgment: (1) the Underlying Arbitration does not constitute a "suit" within the meaning of the Policies; (2) RCIH is seeking damages that it is not legally obligated to pay, as required for coverage under the Policies; (3) Chartis is not liable for damages RCIH

became obligated to pay by reason of assumption of liability in a contract or agreement; and (4) RCIH failed to comply with several of its obligations under the Policies, thereby prejudicing Chartis and precluding coverage.  (Mot. at 9.)  RCIH opposes each of these grounds for summary judgment and further asserts its affirmative defense that Chartis is estopped to raise all of the coverage defenses on which its motion is based.  (Resp. at 15.)  The court will address each of Chartis's arguments in turn, and for the reasons described below, denies Chartis's motion for summary judgment on these issues.  Consequently, the court need not consider RCIH's estoppel defense.

### 1.   Whether the Underlying Arbitration Was a "Suit"

Chartis argues that it had no duty to defend RCIH because the Underlying Arbitration does not qualify as a "suit," as defined in the Policies.  (Mot. at 10-11.)  The Policies provide that Chartis has a duty to defend its insured against any "suit" seeking damages because of "property damage" and states that a "suit" includes an arbitration proceeding to which (1) the insured must submit, or (2) does submit with Chartis's consent.  (NOL Ex. 20 §§ I(1)(a), V(18).)  With respect to whether RCIH was required to submit to the Underlying Arbitration, Chartis highlights the fact that the Contract between the Parties did not require binding arbitration, and argues that RCIH voluntarily entered into the ADR Agreement more than five years later without Chartis's knowledge or consent and therefore was not required to submit to arbitration.  (Mot. at 12.)

The court is not persuaded by Chartis's argument that RCIH was not required to submit to the Underlying Arbitration because it entered into the ADR Agreement years after executing the Contract.  Chartis's argument would have more appeal if the term

"suit" were defined differently as including an arbitration proceeding to which the insured must submit and to which it required to submit at the time of the "occurrence" or offense that gave rise to the proceeding. The definition of "suit," however, simply lacks a temporal requirement that the insured be bound to arbitration at any particular time prior to the arbitration proceeding, and the court may "not add language to the policy that the insurer did not include." *Am. Nat'l Fire*, 951 P.2d at 257. Rather, the language of the Policies, interpreted from the perspective of the average insured, indicates that the time at which to judge whether the arbitration is one to which the insured must submit is at the time the arbitration is initiated: "'Suit' includes . . . [a]n arbitration *proceeding* . . . to which the insured *must* submit . . . ." (NOL Ex. 20 § V(18) (emphases added).) At the time Sound Transit filed its counterclaim, it is undisputed that RCIH was bound by the ADR Agreement to arbitrate the claims. *See* RCW 7.04A.060(1) ("An agreement . . . to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of contract.").[9] As such, the court concludes the Underlying Arbitration qualifies as a "suit" within the meaning of the Policies. The court therefore denies Chartis's motion for summary judgment on this issue.

### 2. Whether RCIH is Legally Obligated to Pay the $1.725 Million Award

Chartis asserts that it has no duty to indemnify RCIH because RCIH is not legally obligated to pay any damages. (Mot. at 13.) Subject to exclusions not relevant here, the

---

[9] Chartis does not claim that the ADR Agreement was invalid, unenforceable, or otherwise not binding on RCIH.

Policies provide that Chartis will "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' . . . ." (NOL Ex. 20 § I(1)(a).) Relying on California law, Chartis maintains that it is not legally obligated to pay because RCIH has not been ordered by a court to pay money, nor is there a judgment against RCIH. (Mot. at 13.) Chartis further argues that even if a court order or judgment is not required, the arbitration award resulted in a net gain to RCIH—even minus the $1.725 million offset in Sound Transit's favor—and therefore RCIH was not obligated to pay any amount to Sound Transit. (*Id.* at 13-14 (citing *3250 Wilshire Blvd. Bldg. v. Emp'rs Ins. of Wausau*, 39 Cal. App. 4th 1277 (Cal. Ct. App. 1995)).) Finally, Chartis contends that if its first two arguments fail, RCIH created the "obligation" by voluntarily executing the ADR Agreement and the Settlement Agreement, which "orchestrated the structure of the Final Award in an effort to secure insurance coverage" for the $1.725 million in damages awarded to Sound Transit. (*Id.* at 14-15.)

The court is not persuaded by Chartis's arguments. First, although Washington courts have not considered whether an insured is "legally obligated to pay" an arbitrator's award, the court concludes that the Washington Supreme Court would hold that an insured is legally obligated to pay an unchallenged award resulting from a binding arbitration. The Court has noted that "[w]hat the insured is legally obligated to pay is the exact issue to be determined in the liability suit." *Mut. of Enumclaw Ins. Co. v. T & G Constr., Inc.*, 199 P.3d 376, 381 (Wash. 2008). There is no reason why this observation would be inapplicable in the context of binding arbitration, and therefore an insured would be legally obligated to pay the amount awarded to its opponent by the arbitrator.

1 Particularly in light of the fact that the Policies do not define the meaning of "legally

2 obligated to pay," a reasonable insured would understand that it is legally obligated to

3 pay an amount awarded at binding arbitration.  This conclusion is supported by the fact

4 that courts have limited ability to review an arbitration award, and where the award is

5 unchallenged, a court must confirm the award as issued by the arbitrator.  *See* RCW

6 7.04A.220 ("[T]he party [to an arbitration proceeding] may file a motion with the court

7 for an order confirming the award, at which time the court *shall* issue such an order

8 unless the award is modified or corrected under RCW 7.04A.200 or 7.04A.240 or is

9 vacated under RCW 7.04A.230." (emphasis added)).  Furthermore, Washington courts

10 likely would not allow an insurer to "escape its obligation" to indemnify simply because

11 the parties to the arbitration have not confirmed the award.  *Cf. Kagele v. Aetna Life &*

12 *Cas. Co.*, 698 P.2d 90, 93 (Wash. Ct. App. 1985).

13   Second, Chartis has failed to cite any Washington law in support of its offset

14 argument, nor has the court found any.  Additionally, the Policies contain no language

15 that would lead a reasonable insured to believe that the term "legally obligated to pay"

16 would not include amounts awarded against it on one issue simply because amounts were

17 also awarded in its favor on other issues.  The court therefore declines to adopt a

18 construction of "legally obligated to pay" that requires a net loss to the insured.

19   The court similarly declines to rule that RCIH is not "legally obligated to pay" the

20 amounts awarded to Sound Transit on Sound Transit's counterclaims because the Parties

21 allegedly "orchestrated" the structure of the final arbitration award to bring the award

22

1 within the scope of the Policies. Chartis's position is not supported by the evidence when

2 viewed in the light most favorable to RCIH.

3    In sum, the court denies Chartis's motion for summary judgment on the issue of

4 whether RCIH was "legally obligated to pay as damages" the $1.725 million awarded

5 against it and in favor of Sound Transit.

6    **3. Whether RCIH Assumed Liability in a Contract or Agreement**

7    Chartis next argues that it has no duty to defend or indemnify RCIH because

8 RCIH assumed liability by way of a contract or agreement. (Mot. at 15-16.) The Policies

9 exclude from coverage "'property damages' for which the insured is obligated to pay

10 damages by reason of the assumption of liability in a contract or agreement." (NOL Ex.

11 20 § I(2)(b).) This exclusion, however, does not apply to "liability for damages . . . [t]hat

12 the insured would have in the absence of the contract or agreement." (NOL Ex. 20 §

13 I(2)(b).) Chartis maintains that by signing the Settlement Agreement, RCIH agreed to

14 assume an obligation to pay $1.725 million to Sound Transit. (Mot. at 16.) Chartis also

15 contends that because the claimed damages existed before both the ADR Agreement and

16 the Settlement Agreement, the exception to the "assumed liability" provision would not

17 apply.[10] (*Id.*)

18

19 _____

20    [10] Chartis makes several other arguments related to liability RCIH allegedly assumed for amounts other than the $1.725 million award in favor of Sound Transit. (Mot. at 15-16.) These

21 arguments, however, ignore that the exclusion only applies to "property damages" for which the insured is obligated to pay. (NOL Ex. 20 § I(2)(b).) The only amount RCIH is obligated to pay

22 is the $1.725 million related to the concrete cracking counterclaim. Thus these arguments do not persuade the court.

1    As an initial matter, the court concludes that RCIH did not assume liability for the

2    damages to Sound Transit in the ADR Agreement.  Although that agreement fixed the

3    range in which damages in RCIH's favor could fall, it did not require that the arbitration

4    panel make any award to Sound Transit:  "[I]n no event shall the total net amount

5    awarded to [RCIH] exceed the upper bracket described in paragraph 6 below.  The term

6    'net' means the amount awarded to [RCIH] after the deduction, *if any*, of amounts

7    awarded in Sound Transit's favor . . . ."  (NOL Ex. 7 ¶ 1; *see also id.* ¶ 6.)  The fact that

8    RCIH did not assume liability for damages in the range of $40 million to $85 million is

9    further evident by the fact that Sound Transit's original damages claim and the actual

10   award were both well below this range established in the ADR Agreement.  Therefore,

11   the only agreement in which RCIH could have assumed liability was the Settlement

12   Agreement.

13       Yet even assuming that RCIH had assumed liability in the Settlement Agreement,

14   RCIH's liability for damages to Sound Transit would have existed absent that agreement.

15   After hearing eight weeks of testimony, the arbitration panel issued its interim award in

16   which it awarded Sound Transit $1.725 million.  RCIH, therefore, was liable for these

17   damages before it executed the Settlement Agreement.  Indeed, the Settlement

18   Agreement reflects this exact amount of damages, as does the final arbitration award.

19   Further, there is no evidence in the record or suggestion by the parties that the arbitration

20   panel's final award would have change the amount awarded to Sound Transit in the

21   interim award if the Parties had not entered into the Settlement Agreement.  The court

22   thus concludes that RCIH would have liability for these damages even absent the

Settlement Agreement.  Accordingly, the court denies Chartis's motion for summary

judgment with respect to the issue of whether RCIH improperly assumed liability for

damages in a contract or agreement.

**4.  Whether RCIH Breached its Obligations Under the Policies, Thereby Prejudicing Chartis**

Finally, Chartis argues that it is not obligated to defend or indemnify RCIH

because RCIH breached its obligations under the Policies by (1) failing to provide timely

notice to Chartis of the claims alleged by Sound Transit; (2) failing to cooperate with

Chartis in the investigation and/or settlement of the claims alleged by Sound Transit; and

(3) voluntarily making a payment, assuming an obligation, and/or incurring expenses

without Chartis's consent.  (Mot. at 9.)  Chartis further asserts that each of these acts or

omissions by RCIH caused Chartis actual prejudice.  (*Id.* at 17-23.)  For the reasons

explained below, the court concludes that genuine issues of material fact regarding

whether Chartis suffered actual and substantial prejudice preclude summary judgment,

and therefore the court need not address whether RCIH breached any of the contractual

provisions as alleged by Chartis.

Where an insured breaches a "notice," "cooperation," or "voluntary payment"

clause of an insurance policy, the insurer is not relieved of its duties under the insurance

policy unless it can show that the late notice, failure to cooperate, or voluntary payment

caused it "actual and substantial prejudice."  *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*,

191 P.3d 866, 876 (Wash. 2008); *Griffin v. Allstate Ins. Co.*, 29 P.3d 777, 783 (Wash. Ct.

App. 2001).  Whether breach of one of these clauses "prejudiced an insurer is a question

of fact, and it will seldom be decided as a matter of law." *Mut. of Enumclaw*, 191 P.3d at 876 (citing *Tran v. State Farm Fire & Cas. Co.*, 961 P.2d 358, 365 (Wash. 1998)). "The insurer has the burden of proving actual and substantial prejudice from the breach." *Id.* (citing *Or. Auto. Ins. Co. v. Salzberg*, 535 P.2d 816, 819 (Wash. 1975)).

In *Mutual of Enumclaw*, the Washington Supreme Court noted that it previously had not defined the precise set of circumstances under which an insured's breach of a notice provision constitutes prejudice as a matter of law.[11] *Id.* As a result, the Washington "Court of Appeals decisions on prejudice have varied widely." *Id.* at 877. The Court explained that some decisions, such as the one in *Canron, Inc. v. Federal Insurance Co.*, 918 P.2d 937 (Wash. Ct. App. 1996), turned on "whether the insurer must show a specific detriment as the result of the prejudice." *Mut. of Enumclaw*, 191 P.3d at 877. By contrast, decisions such as the one in *Northwest Prosthetic & Orthotic Clinic, Inc. v. Centennial Insurance Co.*, 997 P.2d 972 (Wash. Ct. App. 2000), concluded that the insurer "simply needs to show that it lost an opportunity to investigate or defend." *Mut. of Enumclaw*, 191 P.3d at 877. The Court "largely" agreed with the *Canron* court's "more flexible formulation of the rule for prejudice" and criticized *Northwest Prosthetic*'s rule for oversimplifying the law. *Mut. of Enumclaw*, 191 P.3d at 877. The Court explained that a variety of factors may determine whether an insurer is actually

---

[11] Although *Mutual of Enumclaw* involved breach of a "notice" clause, the Court determined that it could look to cases dealing with "consent to settle" and "cooperation" clauses in developing the contours of the "prejudice" rule, reasoning that these types of clauses are intended to prevent the insured's actions from prejudicing the insurer. *Mut. of Enumclaw*, 191 P.3d at 876 n.12. Accordingly, the Court's guidance on prejudice is equally applicable to Chartis's "notice," "cooperation," and "voluntary payment" clause arguments. *See id.*

prejudiced, including: Were damages concrete or nebulous? Was there a settlement or did a neutral decision maker calculate damages; what were the circumstances surrounding the settlement? Did a reliable entity do a thorough investigation of the incident? Could the insurer have eliminated liability given timely notice? Could the insurer have proceeded differently in the litigation? *Id.* at 877-78.

Ultimately, the Court held that "in order to show prejudice, the insurer must prove that an insured's breach of a notice provision has an identifiable and material detrimental effect on its ability to defend its interest." *Id.* at 878. "The rule will manifest itself differently depending on the kind of prejudice an insurer claims." *Id.* For example, "if the insurer claims that its own counsel would have defended differently, it must show that its participation would have materially affected the outcome, either as to liability or the amount of damages." *Id.* As another example, "[i]f the insurer claims that it was deprived of the ability to investigate, it must show that the kind of evidence that was lost would have been material to its defense." *Id.* The Court concluded that its new rule would ensure that the insurer has the burden of proving actual and substantial prejudice. *Id.*

Here, Chartis claims that it was prejudiced as a matter of law because RCIH entered into the ADR Agreement without giving it notice and thereby limited the scope of available judicial review, precluding Chartis from raising "certain defenses to coverage and/or liability" and restricting the scope of investigation and discovery. (Mot. at 19-21 (citing *MacLean Townhomes, LLC v. Am. States Ins. Co.*, 156 P.3d 278 (Wash. Ct. App. 2007)).) Chartis further contends that it was prejudiced as a matter of law when, without

1  Chartis's knowledge or consent, RCIH entered into the Principles of Negotiation

2  Agreement, the Interim Settlement Agreement, the ADR Agreement, and the Settlement

3  Agreement.  (*Id.* at 22-23.)  Chartis maintains that deprivation of its rights to

4  independently investigate, evaluate and present defenses to coverage, and participate in

5  settlement decisions constitutes prejudice, even if timely notice would have resulted in

6  the same outcome.  (*Id.* at 23 (citing *Nw. Prosthetic*, 997 P.2d at 976, and *Key Tronic*

7  *Corp. v. St. Paul Fire & Marine Ins. Co.*, 139 P.3d 383, 386 (Wash. Ct. App. 2006)).)

8        The court disagrees with Chartis's asserted reasons why this case qualifies as one

9  of the rare instances in which prejudice may be decided as a matter of law.  Notably, all

10  of the cases upon which Chartis relies were decided before *Mutual of Enumclaw*, and

11  Chartis fails to address the impact of that decision on the continuing applicability of the

12  cases it cites.  (*See* Mot. at 17-23.)  In any event, the court concludes, for the reasons

13  described below, that the reasoning of some of these cases does not align with the newer

14  rule set forth by the Washington Supreme Court in *Mutual of Enumclaw*, and that other of

15  these cases are factually distinguishable.  The court therefore declines to follow them in

16  order to rule that Chartis has satisfied its burden of establishing prejudice as a matter of

17  law.

18        First, Chartis relies on *MacLean* to argue that RCIH's execution of the ADR

19  Agreement was prejudicial as a matter of law.  (Mot. at 17-21.)  The facts in *MacLean* are

20  similar to those in the instant matter.  The insured learned of potential claims, and before

21  notifying its insurer, it entered into a binding arbitration agreement.  *MacLean*, 156 P.3d

22  at 279.  There was no dispute that the insured failed to give timely notice as required

1  under its insurance policy. *Id.* The insurer argued that the insured's failure to give timely

2  notice was prejudicial as a matter of law because the binding arbitration agreement

3  removed judicial remedies that the insurer might have had otherwise. *Id.* The court

4  agreed, holding that the agreement to binding arbitration precluded the insurer's ability to

5  have full judicial review of its defenses, and that the loss of judicial review was

6  significant. *Id.* at 280. The court primarily relied on *Northwest Prosthetic* and *Key*

7  *Tronic*, both of which found that the insured was prejudiced when it was denied the

8  opportunity to investigate a claim. *MacLean*, 156 P.3d at 280. The court thus rejected

9  the insured's argument that the result would not have been different had it notified the

10  insurer earlier. *Id.*

11        As noted above, the Court in *Mutual of Enumclaw* criticized the *Northwest*

12  *Prosthetic* court's focus on lost opportunity and instead articulated a rule that requires a

13  material detrimental effect on the insurer. *Mut. of Enumclaw*, 191 P.3d at 877-78.

14  Indeed, one example provided by the Court makes clear that if an insurer claims that it

15  would have defended differently, "it must show that its participation would have

16  *materially* affected the outcome, either as to liability or the amount of damages." *Id.* at

17  878 (emphasis added). The second example offered by the Court similarly emphasizes

18  the element of materiality: "If the insurer claims that it was deprived of the ability to

19  investigate, it must show that the kind of evidence that was lost would have been *material*

20  to its defense." *Id.* (emphasis added). In the *MacLean* opinion, there is no indication that

21  the court considered whether the lost opportunity to appeal was material. Indeed, there is

22  no indication that the insurer would have exercised its right to appeal had it been

available or that the result of the appeal would have affected the outcome.  Rather, the court relied on case law that subsequently has been criticized by the Washington Supreme Court, and rejected the insured's argument that timely notice would not have made a difference, a decision that now would be questionable, at best, under *Mutual of Enumclaw*.  Accordingly, this court declines to rely on *MacLean* in deciding whether Chartis has established prejudice as a matter of law.

Next, Chartis relies on *Northwest Prosthetics* and *Key Tronic* to argue that it was prejudiced by RCIH's unilateral decision to enter into the Settlement Agreement and other agreements.  (Mot. at 21-23.)  In *Northwest Prosthetics*, the insured settled the claim without notifying the insurer that a settlement conference was impending.  *Nw. Prosthetics*, 997 P.2d at 974.  The settlement included a large sum of money for a defamation claim, which had been added in an amended complaint and which was covered under the insurance policy, and no money for a seemingly more central wrongful termination claim, which was not covered by the insurance policy.  *Id.* at 975-76.  The court noted that neither the insured nor the claimant had conducted a reliable investigation, and after the litigation ended by settlement, the insurer largely lost the ability to investigate the defamation claim.  *Id.*  The court distinguished *Pulse v. Northwest Farm Bureau, Inc.*, 566 P.2d 577 (Wash. Ct. App. 1977), a case in which the court declined to find that the insurer was prejudiced by receiving notice post-litigation because the litigation achieved a clear cut result that was essentially beyond dispute.  *Nw. Prosthetics*, 997 P.2d at 976.  The *Northwest Prosthetics* court noted that *Pulse* involved concrete damages, rather than nebulous damages like those for defamation, and a neutral

1   decision-maker.  *Id.*  Further, the facts in *Northwest Prosthetics* suggested that the

2   settlement involved fraud.[12]  *Id.* at 976-77.

3        There are several key differences between *Northwest Prosthetics* and the instant

4   dispute.  First, unlike *Northwest Prosthetics*, in which there had been very little

5   investigation prior to the settlement, all parties had ample opportunity to investigate prior

6   to the arbitration award and Settlement Agreement.  Second, after hearing approximately

7   eight weeks of testimony, the neutral arbitration panel determined that RCIH was liable

8   to Sound Transit for $1.725 million in damages, and this is the precise amount reflected

9   in the Settlement Agreement and final arbitration award.  Despite Chartis's claims that

10  RCIH and Sound Transit "orchestrated" the structure of the Settlement Agreement and

11  final arbitration award to ensure that the $1.725 million awarded to Sound Transit would

12  be covered by the Policies, RCIH has submitted evidence that there were no post-

13  arbitration settlement discussions, compromises, discounts, or other concessions made by

14  the Parties (Brummond Decl. ¶ 13).  Viewing the evidence in the light most favorable to

15  RCIH, a reasonable jury could conclude that RCIH neither acted improperly nor

16  prejudiced Chartis by entering into the Settlement Agreement, or any of the other

17  agreements.  *Northwest Prosthetics* does not dictate a different result.

18       In *Key Tronic*, the final case on which Chartis relies, the insured breached its

19  contract with a customer and settled before notifying its insurer of the potential claim.

20  _____

21  [12] Although the *Mutual of Enumclaw* Court criticized the reasoning in *Northwest Prosthetics*, it stated that the *Northwest Prosthetics* court likely would have concluded under the *Mutual of Enumclaw* test that the insurer was prejudiced as a matter of law.  *Mut. of Enumclaw*,

22  191 P.3d at 878 n.13.

*Key Tronic*, 139 P.3d at 384.  When the insurer denied coverage, the insured brought suit,

and the court held that the insurer was prejudiced as a matter of law by the insured's

settlement.  *Id.* at 385.  The court reasoned that the insurer was deprived of the

opportunity to examine the damaged items that gave rise to the customer's claim before

they were destroyed.  *Id.*  As such, the insured put both the nature and the extent of the

loss beyond the insurer's ability to fully investigate.  *Id.*  *Key Tronic* is distinguishable

from the instant dispute for essentially the same reasons that *Northwest Prosthetics* is

distinguishable.  Namely, Chartis had over a year to investigate Sound Transit's claims,

Mr. Martens fully participated in the arbitration process, and the Settlement Agreement

reflected the amount awarded by the arbitration panel in its interim award.

Applying the rule in *Mutual of Enumclaw* to the facts of the instant dispute, and

viewing the facts in RCIH's favor, the court concludes that Chartis has not established

prejudice as a matter of law.  With respect to its lost right to appeal resulting from the

ADR Agreement, there is no evidence in the record that Chartis would have exercised

that right had it been available, much less any evidence that any appeal would have

materially affected the outcome with respect to either RCIH's liability or the amount of

damages.  In fact, RCIH has presented uncontroverted evidence that at no time has

Chartis, through its direct representatives or its defense counsel Mr. Martens, ever

suggested that it deemed the $1.725 million award improper or excessive, or otherwise

indicated that it wished to further challenge or appeal the award.  (Powell Decl. ¶ 10.)

With respect to the Settlement Agreement, there are at least questions of fact regarding

whether Chartis has been prejudiced, particularly in light of the fact that the Settlement

Agreement provided for the same $1.725 million award issued by the arbitration panel in its interim award after hearing eight weeks of testimony and issuing an extensive memorandum supporting its decision. For these reasons and those articulated more fully above, the court denies Chartis's motion for summary judgment on its claims that RCIH's alleged breaches of its obligations under the Policies caused Chartis actual and substantial prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Chartis's motion for partial summary judgment (Dkt. # 27).

Dated this 24th day of June, 2012.


JAMES L. ROBART
United States District Judge